## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **KIDSPEACE CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civ. No. 07-1864 MJD/SRN** |
| | ) | **REDACTED – FULL** |
| | )| **VERSION FILED UNDER SEAL** |
| **v.** | ) | |
| | ) | |
| **LEXINGTON INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff KidsPeace Corporation ("KidsPeace"), by and through its counsel, Briggs and Morgan, P.A. and Gross McGinley, LLP, respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment.

## I.      INTRODUCTION

The above-captioned litigation concerns an insurance coverage dispute between KidsPeace and Defendant Lexington Insurance Company ("Lexington"). The insurance coverage dispute emanates from a separate, previously-filed action brought against KidsPeace by TJ in the matter of <u>TJ v. Mesabi Academy of KidsPeace, Inc., KidsPeace Corporation, et al.</u>, 04CV2847 (D. Minn.) (the "TJ Litigation"). Upon learning of the claim against it in the TJ Litigation, KidsPeace put its insurer Lexington on notice that a claim had been asserted against KidsPeace. Lexington, initially and throughout the pendency of the TJ Litigation, denied insurance coverage to KidsPeace, and declined to pay for KidsPeace's legal defense, despite requests by KidsPeace for Lexington to

assume its defense and to indemnify KidsPeace. Lexington asserted that four coverage

exclusions[1] in the policy applied and barred coverage. The TJ Litigation was eventually

settled and KidsPeace again made a demand to Lexington for indemnification and for its

defense costs, which was denied. After the TJ Litigation was fully settled, this litigation

concerning the extent of KidsPeace's coverage under its insurance policy with Lexington

ensued.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   Relationship Between KidsPeace and KidsPeace Mesabi Academy, Inc.

KidsPeace is a private, not-for-profit corporation, which provides specialized

residential treatment services and a comprehensive range of treatment programs and

educational services for children through separate subsidiary corporations. (Ex. A, Strom

Aff. at ¶¶ 10-11)[2] KidsPeace is not licensed to and does not provide direct child care

services in Minnesota. (Ex. A, Strom Aff. at ¶ 12) KidsPeace is the parent corporation

of KidsPeace Mesabi Academy, Inc. ("Mesabi Academy"), a Pennsylvania corporation

registered to do business in Minnesota with its principal place of business in Minnesota.

(Ex. A, Strom Aff. at ¶¶ 7,11) Mesabi Academy provides residential care, educational

and vocational training, and aftercare services for male youths, including correctional,

detention, and other juvenile justice services – including treatment of sexual offenders.

(Ex. A, Strom Aff. at ¶ 8-9) Mesabi Academy is licensed by the Minnesota Department

---

[1] The exclusions relied upon by Lexington in its denial were for Sexual Misconduct, Employer's Liability, Insured vs. Insured, and Employment Practices, as more fully discussed, infra.
[2] References to the Exhibits attached to the Affidavit of Susan Ellis Wild in Support of Plaintiff's Motion for Summary Judgment are cited herein as "Ex. ___."

of Corrections. (Ex. A, Strom Aff. at ¶ 9)  Most of the youths for whom Mesabi Academy

provides correctional services are there because of convictions for violent and/or

aggressive behavior, including murder and rape.  (Ex. A, Strom Aff. at ¶ 9)

**B.**   <u>**KidsPeace Secures Insurance Coverage.**</u>

In September 2002, Lexington issued KidsPeace an insurance policy, No. 2004826

(the "2002 Policy"), with effective dates of September 15, 2002 through September 15,

2003.  (<u>See</u> Ex. B, 2002 Policy at Declarations page)  The 2002 Policy provided two

types of insurance coverage:  Healthcare General Liability ("GL Coverage") and

Healthcare Professional Liability ("PL Coverage"), (Ex. B, 2002 Policy at Declarations

page), and was a renewal of a policy Lexington had initially issued KidsPeace on

September 15, 2001 (the "2001 Policy").  (<u>See</u> Ex. C, 2001 Policy)

Myers, Benner Corporation ("Myers") was the insurance brokerage through which

KidsPeace obtained its Lexington insurance policies.  (Ex. D, Emigh Dep. at 13)  Myers

began to act as the insurance broker for KidsPeace in 1981 and, by 1992, was broker for a

number of types of insurance policies for KidsPeace, including general liability insurance

and professional liability insurance.  (Ex. D, Emigh Dep. at 13-14)  From 2000 to 2001,

Myers secured general liability coverage, professional liability coverage, and umbrella

coverage for KidsPeace with the PHICO Insurance Company ("PHICO").  (Ex. D, Emigh

Dep. at 25)  During 2001, however, PHICO went into liquidation, and Myers began to

search for a replacement carrier for the insurance policies KidsPeace had with PHICO.[3]
(Ex. D, Emigh Dep. at 25)

During this period, Peter J. Emigh was the producer (i.e., insurance agent) at
Myers assigned to the KidsPeace account. (Ex. D, Emigh Dep. at 14)  Harry Bielecki, a
marketing manager at Myers who at the time was responsible for submitting applications
to insurance companies and negotiating with the carriers on terms and conditions,
contacted National Specialty Underwriters ("NSU") to assist in securing coverage. (Ex.
D, Emigh Dep. at 29, 40; Ex. E, Letter from H. Bielecki to NSU, dated August 3, 2001)
NSU is a wholesale brokerage firm that assists retail brokers in accessing additional
insurance companies and procuring alternative quotes. (Ex. F, Waterman Dep. at 13)
Jonathan Waterman, an Account Executive at NSU, approached AIG Healthcare with a
submission for insurance on behalf of KidsPeace (Ex. G, letter from J. Waterman of NSU
to Valerie Marsiano of AIG Healthcare, dated August 7, 2001)  Waterman assisted Myers
in securing insurance coverage for KidsPeace, and communicated various requests for
information to and from Lexington. (Ex. F, Waterman Dep. at 16, 38)  The
communications between Waterman and representatives of Myers encompassed multiple
issues relating to KidsPeace and its operations, including details of KidsPeace's former
insurance policies with PHICO and the content of the sexual abuse and molestation
coverage contained therein. (Ex. H, e-mail from J. Waterman  to H. Bielecki requesting

---

[3] As an organization, KidsPeace has significant exposure to high losses due to the specific
services it specializes in and provides—particularly in connection with the services it
provides to emotionally disturbed children. (Ex. D, Emigh Dep. at 12)  As a result of the
risks associated with KidsPeace's business, there are a limited number of insurers willing
to consider insuring KidsPeace.  (Ex. D, Emigh Dep. at 31-32)

information as to KidsPeace operations)  After discussing the KidsPeace account with

Mr. Bielecki, Mr. Waterman advised Mr. Bielecki of a program at Lexington that could

satisfy KidsPeace's insurance needs.  (Ex. I, Bielecki Dep. at 32)  Mr. Bielecki described

to Mr. Waterman the breakdown of KidsPeace's operations and exposures.  (Ex. I,

Bielecki Dep. at 33)  Utilizing his contacts at Lexington, Mr. Waterman helped to

procure coverage for KidsPeace by forwarding KidsPeace's application for coverage to

Lexington, and conducted discussions with Lexington which ultimately culminated in the

issuance of the 2001 and 2002 policies.  (Ex. I, Bielecki Dep. at 33, 58)

C.    **Negotiation of 2001 Policy and Sexual Misconduct Liability Coverage**

After KidsPeace submitted a general liability coverage application to Lexington

through Myers and NSU, KidsPeace (through the insurance brokerage firms) and

Lexington engaged in negotiations to secure coverage.  The individuals involved in the

negotiations included Richard Boyer at KidsPeace, Messrs. Emigh and Bielecki at Myers,

Mr. Waterman at NSU, and Debra Olson (formerly Debra Koch) at Lexington.  (Ex. J,

Boyer Dep. at 43-44; Ex. D, Emigh Dep. at 19; Ex. I, Bielecki Dep. at 32-34; Ex. F,

Waterman Dep. at 38-39, 55-56; Ex. K, Olson Dep. at 18-19)  At the time, Mr. Boyer was

the KidsPeace executive who was responsible for KidsPeace's risk management and who

dealt directly with Myers.  (Ex. J, Boyer Dep. at 10)  Messrs. Emigh and Bielecki

produced and marketed with Myers, (Ex. D, Emigh Dep. at 14; Ex. I, Bielecki Dep. at

11), and Mr. Waterman was their contact person at NSU who secured coverage for

KidsPeace through Ms. Olson, a Senior Production Specialist at Lexington.  (Ex. F,

Waterman Dep. at 38-39, 55-56; Ex. K, Olson Dep. at 18-19)

In securing a new policy with Lexington, KidsPeace sought to obtain coverage similar to the coverage provided by its 2000 PHICO policy, and, to obtain such coverage, KidsPeace knew it would have to pay a substantial premium. (Ex. J, Boyer Dep. at 106) NSU and Lexington recognized the significance of the KidsPeace account.  Through correspondence, Mr. Waterman and Ms. Olson acknowledged the enormous premium KidsPeace would have to pay for the coverage it sought.  On September 13, 2001, Ms. Olson sent a fax to NSU, which referenced a prior conversation between Mr. Waterman and Ms. Olson during which the two delighted in handling KidsPeace's $1,000,000 account.  (See Ex. L, Fax from Olson to NSU re: KidsPeace Corporation)  KidsPeace ultimately paid Lexington a premium in excess of $800,000 for the 2001 Policy. (Ex. F, Waterman Dep. at 129)  The sizeable amount of KidsPeace's annual premium was due to the high level of exposure associated with the business of KidsPeace and its subsidiaries. (Ex. J, Boyer Dep. at 107-108; Ex. D, Emigh Dep. at 34-35)  In 2002, KidsPeace paid Lexington $862,207 for its primary insurance coverage, and an additional $538,845 for umbrella coverage.  (Ex. Y, Primary Quote Premium Summary)   Again in 2002, the importance of this account to Lexington was acknowledged by its own representatives, in an e-mail exchange initiated by Deborah Koch of AIG Healthcare.  (Ex. N, e-mails of September 10-11 and 16-17, 2002)

Throughout negotiations, the potential for liability for sexual misconduct particularly concerned both KidsPeace and Lexington.  (Ex. F, Waterman Dep. at 134; Ex J, Boyer Dep. at 76-77)  Awareness of and discussions concerning the need for insurance coverage for such acts is documented in various communications between Myers and

6

NSU. (Ex. O, Memorandum from Myers to NSU dated August 31, 2001, referencing the prior PHICO coverage for Sexual Abuse & Molestation; Ex. P, Letter from Myers to NSU dated September 7, 2001; Ex. Q, Internal Memorandum of Myers referencing "9/15/01 New Business - Discussion Items with John Waterman," including Sexual Abuse & Molestation coverage)   Such liability is inherent to the operation of various KidsPeace facilities, and certainly was the case with Mesabi Academy. This issue was KidsPeace's paramount concern in its procurement of insurance coverage. (Ex. J, Boyer Dep. at 76-77)   Due to Myers' long-standing relationship with KidsPeace, it too was well aware of KidsPeace's concerns with respect to sexual misconduct liability. (Ex. D, Emigh Dep. at 31-32; Ex. I, Bielecki Dep. at 51)   In fact, the communications between all of parties involved in the negotiation of the 2001 Policy evidence their awareness of the significance of sexual misconduct liability coverage to KidsPeace. (Ex. J, Boyer Dep. at 76-77; Ex. D, Emigh Dep. at 31-32; Ex. F, Waterman Dep. at 134; Ex. I, Bielecki Dep. at 51)

With respect to KidsPeace's concerns about sexual misconduct liability coverage, Mr. Boyer testified:

> A.    [S]exual abuse was probably our biggest worry from an insurance standpoint, from a liability standpoint.
>
> Q.    Did you and Mr. Emigh specifically discuss KidsPeace's potential sexual abuse liability?
>
> A.    That came up all the time at renewal, especially at renewal time.
>
> Q.    And was sexual abuse liability a concern at all the facilities or some more than others?

7

A.   That was a concern at all the facilities and all the programs.

Q.   Because you dealt with children?

A.   Because we dealt with children, and even though we – we did all the background checks and every check that we're supposed to do with our child care staff, which was enormous, you know, I said we had 24, 2500 employees, probably 75 percent of those were child care staff who had a lot of direct access with kids.
So that was always a major concern of ours from a liability standpoint.

Q.   So to make sure I understand, the liability concern was with the KidsPeace employees, correct?

A.   *I think it was sexual abuse – we – we have a facility where we deal with – with perpetrators of sexual abuse. We have a large number of those as clients. I think to portray it as only client to – our staff to client would not be fair. I think we were concerned about both, about our staff to clients who were certainly vulnerable, but also our concern from clients to staff because of the reasons they were in here for treatment in the first place.*

Q.   Also concerns about clients to clients?

A.   Also concerned about client to client.

Q.   Okay.

A.   So any conceivable relationship, sexual abuse in total, using that in total, that was a major concern of ours.

(Ex. J, Boyer Dep. at 76-77 (emphasis added))

Sexual misconduct language and coverage was negotiated by Mr. Waterman with

Ms. Koch and Mr. Loveall at Lexington by discussions (Ex. F, Waterman Dep. at 55-

56); in e-mail, "some kind of sexual abuse coverage is needed on an account like this"

(Ex. F, Waterman Dep. at 114-115; Ex. R, e-mail from J. Waterman to D. Koch, dated

8/30/2001); and by telefax:

As I explained to Val/Mark yesterday, we would like to have some additional sexual abuse coverage in the current quote. If it is not available, we need to look at the separate sexual abuse product for full limits.

(Ex. F, Waterman Dep. at 124-125; Ex. S, fax from NSU Healthcare to Deb Koch/Mark Loveall of AIG, dated 9/15/2001, attaching KidsPeace completed application for sexual abuse policy)

And these negotiations in 2001 resulted in some unique offerings by AIG to provide insurance coverage to KidsPeace as explained by Mr. Waterman:

Again, during the course of negotiating with AIG, my recollection is that they made it clear that they would not provide the same type of wording which can be translated as the same amount of coverage [as provided by PHICO] or certainly was questioning the amount of sexual abuse coverage or how sexual abuse claims would be handled and to what limit under the AIG policy.

Because we all recognized that would be a limitation or potential reduction from what they [KidsPeace] had had previously, we were looking for options or ways with AIG to include more coverage or to try to get the language to be more inclusive. And I do specifically recall because it was very rare and still is, quite frankly, in my business to ever quote a separate sexual abuse policy. But AIG was willing to do that here, and they did offer an option. I believe we did quote that.

(Ex. F, Waterman Dep. at 125) Lexington was unwilling to offer KidsPeace coverage as broad as it had under its 2000 Policy with PHICO. (Ex. F, Waterman Dep. at 134) NSU notified Myers that AIG would not modify the sexual abuse provision in the basic 2001 policy, but would offer a "stand alone" policy. The representative from NSU initially indicated that the separate sexual abuse policy would cost a minimum of $25,000 (Ex. T, Fax Cover Sheet from NSU to Harry Bielecki, dated 8/31/2001), and KidsPeace applied for that coverage. (Ex. U, Letter from Myers to NSU dated September 4, 2001, enclosing

Sexual Midsconduct [sic] Liability Insurance Application; Ex. S, Fax Cover Sheet from NSU to Deb Koch/Mark Loveall, dated September 5, 2001, and attached completed sexual abuse application from KidsPeace) Ultimately, Lexington offered KidsPeace a separate sexual misconduct policy that would have required an additional $195,000 annual premium, and because of the cost, KidsPeace opted not to purchase this separate policy. (Ex. D, Emigh Dep. at 136)  Significantly, KidsPeace based its decision to decline the separate policy on its knowledge that the sexual misconduct exclusion contained in the proposed 2001 Policy did <u>not</u> exclude coverage for sexual misconduct committed by a client, which was one of KidsPeace's primary concerns. (Ex. D, Emigh Dep. at 138; Ex. J, Boyer Dep. at 76-77, 110-111)  Having addressed this and other issues after extensive negotiations, KidsPeace and Lexington agreed upon the terms of the 2001 Policy and Lexington issued the 2001 Policy, which provided coverage for the period of September 15, 2001 to September 15, 2002.  (See Ex. C, 2001 Policy at Declaration page)

### D.    TJ's Employment with Mesabi Academy and the Basis of the TJ Litigation.

Mesabi Academy hired TJ, the plaintiff in the underlying TJ Litigation, in 2002 as a youth care worker. (Ex. V, TJ Compl. at ¶ 5)  TJ was trained and worked in the "Discovery Unit," which exclusively houses youths who are receiving sex offender treatment. (Ex. V, TJ Compl. At ¶ 6; Ex. A, Strom Aff. at ¶ 5)  On or about June 28, 2003, DC, who was then one of Mesabi Academy's residents or "clients" in the Discovery Unit, sexually assaulted TJ. (Ex. V, TJ Compl. at ¶¶ 10, 42-44)  DC was

ultimately convicted of the sexual assault of TJ and he was sentenced to 24 years in

prison. TJ filed the TJ Litigation in the United States District Court for the District of

Minnesota against, among others, KidsPeace and Mesabi Academy. (Ex. V, TJ

Complaint) TJ alleged, *inter alia*, that KidsPeace's negligent design of the facility and its

negligent training and supervision of Mesabi Academy staff led to her rape. (Ex. V, TJ

Complaint at ¶¶ 63-66) Upon learning of the TJ Litigation, KidsPeace put Lexington on

notice that a claim had been asserted against KidsPeace.

### E.     Lexington's General Liability Insurance Coverage

The 2001 Policy was renewed at the end of its term. (Ex. B, 2002 Policy at

Declaration page) It was this renewal policy, the 2002 Policy, with a policy period of

September 15, 2002 to September 15, 2003, that was in place at the time of TJ's sexual

assault. (Ex. B, 2002 Policy at Declaration page; Ex. V, TJ Complaint at ¶¶ 42-44) Both

the 2001 Policy and the renewal 2002 Policy provided general liability – GL Coverage.

(Ex. C, 2001 Policy at Declaration page; Ex. B, 2002 Policy at Declaration page) The

GL Coverage under the 2002 Policy had insurance limits of $3,000,000 in the aggregate

and $1,000,000 per occurrence. (Ex. B, 2002 Policy at Declaration page) The 2002

Policy's GL Coverage included a $100,000 deductible. (Ex. B, 2002 Policy at

Declaration page)

In accordance with the 2002 Policy, Lexington was obligated to indemnify

KidsPeace for "those sums that an **Insured** becomes legally obligated to pay as damages

because of **bodily injury** or **property damage** to which this Coverage Part applies."[4]

(Ex. B, 2002 Policy at HGL-1 (emphases in original))[5] The 2002 Policy defines those

that are insured, in pertinent part, as "**[y]ou**" and "**[y]our employees,** other than **your**

**executive officers** . . . but only for acts within the scope of their employment by **you** or

while performing duties related to the conduct of **your** business." (Ex. B, 2002 Policy at

HGL – 2) (emphases in original). The terms "you" and "your" encompass both

KidsPeace (as the "First Named Insured") and Mesabi Academy (as an "other Named

Insured"). (Ex. B, 2002 Policy at 1, Endorsement No. 8)

The 2002 Policy contains a number of exclusions from coverage. The GL

Coverage of the 2002 Policy includes "Sexual Misconduct," "Employer's Liability,"

"Insured vs. Insured," and "Employment Practices" exclusions. (Ex. B, 2002 Policy at

HGL – 3 to HGL – 6) These exclusions are set forth as follows:

J.     Sexual Misconduct

Any sexual act, including without limitation, sexual intimacy (even if
consensual), sexual contact, sexual advances, requests for sexual favors,
sexual molestation, sexual assault, sexual abuse, sexual harassment, sexual

---

[4] The GL Coverage under the 2002 Policy provides: "This Coverage part applies to
**bodily injury** and **property damage** only if: . . . 1. The **bodily injury** or **property**
**damage** is caused by an **occurrence** that takes place in the coverage territory; and . . . 2.
The **bodily injury** or **property damage** occurs during the **policy period.**" (Ex. B, 2002
Policy at HGL-1 (emphases in original)) The 2002 Policy defines "bodily injury," in
pertinent part, as "physical injury, sickness or disease sustained by any person . . . ." (Ex.
B, 2002 Policy at 1) The 2002 Policy defines "occurrence," in pertinent part, "[a]s
respects **bodily injury, property damage** or medical expense, an accident . . . which
results in **bodily injury** or **property damage** neither expected nor intended from the
standpoint of the **Insured.**" (Ex. B, 2002 Policy at 4 (emphases in original))
[5] The words in boldface type appear that way in the insurance policies and are defined
terms in the policies.

exploitation, or other verbal or physical conduct of a sexual nature. However, this exclusion does not apply to:

1.  Any Specific Individual **Insured** who allegedly committed such sexual misconduct, unless it is judicially determined that the Specific Individual **Insured** committed the sexual misconduct. If it is judicially determined that the Specific Individual **Insured** committed the sexual misconduct we will not pay any damages.

2.  Any other **Insured**, unless that **Insured**:

    a.  knew or should have known about the sexual misconduct allegedly committed by the Specific Individual **Insured**, but failed to prevent or stop it; or

    b.  knew or should have known that the Specific Individual **Insured** who allegedly committed the sexual misconduct had a prior history of such sexual misconduct.

We will defend **claims** alleging such acts until final adjudication.

As used in this exclusion, Specific Individual **Insured** includes employees and authorized volunteer workers while performing duties related to the conduct of **your** business.

(Ex. B, 2002 Policy, HGL – 5-6 (emphases in original))

B.  Employer's Liability

1.  **Bodily Injury** to an **employee** of **yours** arising out of and in the course of:

    a.  Employment by **you**; or

    b.  Performing duties related to the conduct of **your** business; or

    c.  Any Occupational Disease; or

2.  Any **claims** or **suits** brought by a spouse, child, grandparent, parent, brother, or sister of that **employee** as a consequence of paragraph 1. above.

This exclusion applies:

13

1.      Whether **you** may be liable as an employer or in any other capacity; and

2.      To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by **you** under an **insured contract**.

(Ex. B, 2002 Policy at HGL – 4 (emphases in original))

M.      Insured vs. Insured

Any **claims** made by one **Insured** against another **Insured**.

(Ex. B, 2002 Policy at HGL – 6 (emphases in original))

F.      Employment Practices

Any refusal to employ, termination of employment, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or other practices or policies related to employment or professional privileges.

(Ex. B, 2002 Policy at HGL – 5)

With the exception of the Sexual Misconduct exclusion, upon renewal, each of the above exclusions to the GL Coverage of the 2002 Policy carried over, verbatim, from the exclusions to the GL Coverage contained in the 2001 Policy. (Compare Ex. B, 2002 Policy at HGL – 3 to HGL – 6 with Ex. C, 2001 Policy at HGL – 4 to HGL – 6; Ex.W, Position Letter sent by D. Paxton to S. Wild dated September 18, 2007 at FN 3) But, as for the Sexual Misconduct exclusion, Lexington unilaterally changed it to expand the exclusion and reduce coverage without providing KidsPeace notice of the change. (Ex. K, Olson Dep. at 69, 83-85; Ex. J, Boyer Dep. at 122)

14

F.    **The TJ Litigation**

After the June 28, 2003 sexual assault, TJ initially filed a claim against Mesabi

Academy with the Minnesota Department of Human Rights for sexual discrimination and

harassment by supervisors and co-workers, which was referred to the Equal Employment

Opportunity Commission ("EEOC").  (See Ex. X, Charge of Discrimination filed jointly

with MN Dept. of Human Rights and EEOC by TJ)  The claim was dismissed after the

EEOC issued a right-to-sue letter.  She subsequently filed a civil lawsuit against, among

others, KidsPeace and Mesabi Academy.  (See Ex. V, TJ Complaint)[6]  The only

allegation in the TJ Litigation that pertained to KidsPeace asserted that Mesabi Academy

paid KidsPeace to provide training to Mesabi Academy staff members and to provide

designs for Mesabi Academy facilities.[7]  (Ex. V, TJ Complaint ¶¶ 63-66)  According to

the Complaint in the TJ Litigation, KidsPeace negligently performed these duties, which

allegedly resulted in inadequately trained staff members and dangerous facilities.  (Ex. V,

TJ Complaint ¶ 65)  TJ alleged that KidsPeace's negligence led to her rape.  (Ex. V, TJ

Complaint ¶ 66)

On August 2, 2006, the TJ Litigation settled.  TJ agreed to accept the sum of

$2,000,000 in settlement of her claims.  (Ex. Y, TJ Litigation Settlement Agreement)

Under the terms of the settlement agreement, $1,300,000 of the $2,000,000 settlement

---

[6] The complaint in the TJ Litigation was filed initially in Minnesota state court, but
subsequently was removed to United States District Court for the District of Minnesota,
Case No. 04CV2847.
[7] The claims TJ asserted against Mesabi Academy in the TJ Litigation were for sex
discrimination, hostile work environment, retaliation, and sexual harassment, under
federal civil rights statutes and the Minnesota Human Rights Act. (See Ex. V, TJ
Complaint)

was paid by Chubb Insurance Company – a second insurer with which KidsPeace had insurance coverage for claims arising from employment practices.[8]  (Ex. Y, TJ Litigation Settlement Agreement)  Because Lexington had refused to provide any coverage, KidsPeace directly paid TJ the sum of $700,000 to resolve the negligence claims against KidsPeace.  (Ex. Z, Letter from S. Wild to E. Matonich dated August 24, 2006, and accompanying check dated August 22, 2006)

### G.   Lexington's Denial of Coverage

In accordance with the terms of the 2002 Policy, KidsPeace made a demand upon Lexington to provide KidsPeace's defense in the TJ Litigation and to indemnify it for any award or settlement.  By letter dated December 11, 2003, Lexington denied coverage for the claim brought against KidsPeace in the TJ Litigation and declined to provide KidsPeace's defense, asserting that the Employer's Liability, Employment Practices, Sexual Misconduct, Employer's Liability, and Insured vs. Insured exclusions to the general liability coverage each precluded coverage for KidsPeace under the 2002 Policy. (Ex. BB, Denial Letter dated December 11, 2003)  During the pendency of the TJ Litigation, and prior to settlement of the TJ Litigation, KidsPeace again sought coverage for the negligence claim brought against it, but Lexington reiterated its position and again

---

[8] Chubb issued a claims-made Directors, Officers and Trustee Liability Insurance policy to KidsPeace Corporation with effective dates of 9/15/2003 to 9/15/2004.  Pursuant to this policy, Chubb accepted the tender of the claims for wrongful employment practices, and provided a defense to KidsPeace Mesabi Academy for those claims, as well as indemnification at the time of settlement.  (Ex. AA, Chubb Letter dated January 14, 2004)

denied coverage. (Ex. CC, Letter from S. Wild to B. Emery dated June 20, 2006; Ex. DD Denial Letter dated July 13, 2006; Ex. EE, Denial Letter dated October 2, 2006)

The Sexual Misconduct exclusion contained in the GL Coverage of the 2001 Policy had excluded coverage only for acts by insureds or their employees, and only under certain circumstances. (Ex. C, 2001 Policy at HGL – 6)  The 2001 Policy did not exclude coverage for sexual misconduct committed by a non-employee of the insured, such as a client (e.g., DC). (Ex. K, Olson Dep. at 76; Ex. D, Emigh Dep. at 56) However, when the policy was renewed in 2002, Lexington unilaterally reduced KidsPeace's coverage when it renewed the Policy. (Compare Ex. B, 2002 Policy at HGL – 5 to HGL – 6 with Ex. C, 2001 Policy at HGL – 6; Ex. K, Olson Dep. at 69)  In the 2002 Policy, the exclusionary language was expanded – without notice to KidsPeace -- to include "any sexual acts" committed by anyone – including both employees of the insured and non-employees. (Compare Ex. B, 2002 Policy at HGL – 5 to HGL – 6 with Ex. C, 2001 Policy at HGL – 6)  At no time before issuance of the policy was KidsPeace made aware of Lexington's reduction of its coverage. (Ex. J, Boyer Dep. at 122; Ex. K, Olson Dep. at 83-85) Lexington failed to notify KidsPeace of any change in the scope of the "Sexual Misconduct" exclusion, nor was KidsPeace put on notice in any way that a substantial and material change had been made to the "Sexual Misconduct" exclusion. (Ex. K, Olson Dep. at 83-85) The 2002 Policy, with the revised "Sexual Misconduct" exclusion language buried deep within, was not received by KidsPeace until after the policy period for the 2002 Policy had begun. (Ex. D, Emigh Dep. at 68)  The other exclusions cited by Lexington to preclude coverage for TJ's claim against KidsPeace

17

remained identical to their counterparts in the 2001 Policy. (Compare Ex. B, 2002 Policy at HGL – 3 to HGL – 6 with Ex. C, 2001 Policy at HGL – 4 to HGL – 6; Ex. W, Position Letter sent by D. Paxton to S. Wild dated September 18, 2007 at FN 3)

Following Lexington's denial of coverage for TJ's claim against KidsPeace in the TJ Litigation and its failure to reimburse KidsPeace $600,000 ($700,000 settlement minus $100,000 deductible), KidsPeace commenced this action on April 11, 2007, seeking a declaration that the insurance policy between KidsPeace and Lexington obligates Lexington to reimburse KidsPeace for the portion of the settlement KidsPeace paid TJ to settle her negligence claim against KidsPeace, i.e., $600,000 ($700,000 minus its $100,000 deductible), and requires Lexington to reimburse KidsPeace $168,311.71, for its defense costs. (See Ex. FF, Carol Williams Aff.; Ex. G, Debra X. O'Donnell Aff.) In addition to declaratory relief, KidsPeace seeks an award of $600,000 in monetary damages for its out-of-pocket settlement payments in the TJ Litigation (again, after subtracting its $100,000 deductible under the 2002 Policy), and $168,311.71, for the reimbursement for the defense costs it incurred in the TJ Litigation. (See Ex. FF, Williams Aff.; Ex. G, O'Donnell Aff.)

## III.   LEGAL ARGUMENT

### A.   Standard for Summary Judgment

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if it could change the

outcome of the suit under applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986).  The non-moving party receives the

benefit of all reasonable inferences. General Marketing Services, Inc. v. American

Motorsports, Inc., 393 F.Supp.2d 901, 904 (D. Minn. 2005).  A party defending against a

motion for summary judgment must, however, set forth specific facts showing that there

is a genuine issue for trial, and may not rely on mere allegations or denials in its

pleadings. Id.; Fed. R. Civ. P. 56(e).  If, after giving the non-moving party the benefit of

all reasonable inferences, the court determines that there is no genuine issue of material

fact, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).

Here, the undisputed facts require entry of summary judgment in favor of

KidsPeace and against Lexington.

**B.      TJ's Claims Against KidsPeace Are Covered
         Under the GL Coverage of the Lexington Policy.**

As a general principle, the interpretation and construction of insurance policies is a

question of law for the court and, therefore, such cases are particularly susceptible to

resolution on summary judgment. John Deere Ins. Co. v. Shamrock Industries, Inc., 929

F.2d 413, 417 (8th Cir. 1991) (Minnesota law); Johnson v. Madelia Lake Crystal Mut. Ins.

Co., No. C6-01-1918, 2004 WL 61057, at *3 (Minn. Ct. App. Jan. 13, 2004).  An

insurance policy should be construed according to the plain meaning of the words used

and, in the absence of ambiguity, the words used must be understood in their plain and

ordinary sense in order to give effect to the intention of the parties as it appears from the

entire contract. Aetna Ins. Co. v. Getchell Steel Treating Co., 395 F.2d 12, 16 (8th Cir.

1968) (Minnesota law); Thommes v. Milwaukee Ins. Co., 641 N.W.2d 877, 880 (Minn.

2002). However, since an insurance policy is written by the insurer, if any ambiguity or

reasonable doubt as to its meaning exists, then the court must construe the language in

favor of the insured and against the insurer. Getchell Steel, 395 F.2d at 16; Thommes,

641 N.W.2d at 880. Where an insurer relies on a policy exclusion as the basis for its

denial of coverage and refusal to defend, the insurer bears the burden of proving the

applicability of the exclusion as an affirmative defense and such exclusions are narrowly

interpreted against the insurer and in accordance with the reasonable expectations of the

policyholder. Thommes, 641 N.W.2d at 880; SCSC Corp. v. Allied Mut. Ins. Co., 536

N.W.2d 305, 313-14 (Minn. 1995).

      Here, Lexington improperly denied GL Coverage for KidsPeace for the negligence

claim brought against it in the TJ Litigation. Under the 2002 Policy, Lexington was

obligated to indemnify KidsPeace for "those sums that an **Insured** becomes legally

obligated to pay as damages because of **bodily injury** or **property damages** to which

this Coverage Part applies." (Ex. B, 2002 Policy at HGL-1 (emphases in original)) The

GL Coverage under the 2002 Policy applies if the bodily injury "is caused by an

**occurrence** that takes place in the coverage territory;" and if the bodily injury "occurs

during the **policy period**." (Ex. B, 2002 Policy HGL-1 (emphases in original))

Lexington has not disputed that the bodily injury upon which TJ based her claim met

these requirements. Instead, Lexington contends that the Sexual Misconduct, Employer's

Liability, Employment Practices, and Insured vs. Insured exclusions to the GL Coverage

in the 2002 Policy each preclude coverage for KidsPeace. Lexington is mistaken. Because each of the exclusions cited by Lexington is inapplicable here, TJ's claim against KidsPeace is covered under the GL Coverage of the 2002 Policy. Accordingly, KidsPeace's motion for summary judgment should be granted.

**C.   The Sexual Misconduct Exclusion Does Not Bar Coverage.**

The Sexual Misconduct exclusion contained in the 2002 Policy does not bar coverage. Because Lexington expanded the exclusion when it renewed the Policy without apprising KidsPeace of the change, the Sexual Misconduct exclusion in the 2002 Policy is void as a matter of law.

Under Minnesota law, if an insurer substantially reduces the insurance coverage it provides to the insured, whether through a policy renewal, modification, or endorsement, it must notify the insured of the change in writing. Bast v. Capital Indemnity Corp., 562 N.W.2d 24, 27 (Minn. Ct. App. 1997); Canadian Universal Ins. Co., Ltd. v. Fire Watch, Inc., 258 N.W.2d 570, 575 (Minn. Sup. Ct. 1977). The insurer must bring the changes to the policyholder's attention by sending a cover letter or by placing a conspicuous heading on the amendatory endorsement. Benton v. Mutual of Omaha Ins. Co., 500 N.W.2d 158, 160 (Minn. Ct. App. 1993). The notice should clearly and prominently state that significant changes are being made. Id. Absent notice, a reduction in coverage is void and the policy remains unchanged. Id. Any question of the insured's coverage is then determined in accordance with the terms of the original policy prior to the renewal or endorsement.

The Sexual Misconduct exclusion contained in the 2001 Policy would not have precluded coverage if a sexual assault was committed by a resident of Mesabi Academy against one of its employees. (Ex. C, 2001 Policy at HGL – 6)  This fact was admitted by Lexington's own witness, Deborah Olson, who had been the underwriter responsible for the issuance of the KidsPeace policies. (Ex. K, Olson Dep. at 76)  The exclusion in the 2001 Policy states that Lexington will not provide coverage for claims alleging:

Sexual Misconduct

Any sexual physical contact, sexual abuse or verbal harassment *by any Insured* including you.  However, this exclusion shall not apply to you for allegations of sexual physical contact, sexual abuse or verbal sexual harassment against you, provided that an Insured other than you committed these offenses and you did not direct or have knowledge of the sexual physical contact, sexual abuse, or verbal sexual harassment.  We will defend claims alleging such acts until final adjudication.

(2001 Policy at HGL – 6 (emphasis added))[9]  Thus, by its terms, the exclusion applies only to sexual misconduct committed by any insured.  Here, coverage for TJ's claim against KidsPeace would not have been excluded under the 2001 Policy because a client of Mesabi Academy, such as DC, is not an insured under the Policy and TJ did not allege that KidsPeace directed or had knowledge of DC's sexual misconduct. (Ex. B, 2002 Policy at HGL-2; Ex. V, TJ Complaint)

Unlike the 2001 Policy, the revised Sexual Misconduct exclusion in the renewed 2002 Policy provides that GL Coverage does not apply to any occurrence, claim or suit arising out of:

---

[9] Notably, while the exclusion expressly states that Lexington will provide a defense for such claims, Lexington declined to provide KidsPeace with a defense in the TJ Litigation.

> ***Any sexual act***, including without limitations, sexual intimacy (even if
> consensual), sexual contact, sexual advances, requests for sexual favors,
> sexual molestation, sexual assault, sexual abuse, sexual harassment, sexual
> exploitation, or other verbal or physical conduct of a sexual nature.

(Ex. B, 2002 Policy, HGL – 5 (emphasis added))  In contrast to the Sexual Misconduct

exclusion in the 2001 Policy, which only extended to sexual acts committed by an

insured (with certain caveats), the Sexual Misconduct exclusion contained in the 2002

Policy includes any sexual act, not just sexual acts committed by an insured.

Unbeknownst to KidsPeace, Lexington significantly reduced KidsPeace's GL Coverage

by expanding the Sexual Misconduct exclusion to encompass all sexual misconduct,

including circumstances in which a Mesabi Academy client sexually assaults one of its

employees.  (Compare Ex. C, 2001 Policy at HGL – 6 with Ex. B, 2002 Policy at HGL –

5 to HGL – 6; Ex. J, Boyer Dep. at 122)  Lexington failed to provide KidsPeace with the

notice required by Minnesota law where an insurer makes such a substantial reduction in

coverage.  (Ex. J, Boyer Dep. at 122; Ex. K, Olson Dep. at 83-85)  Therefore, the

reduction in coverage is invalid and the analysis of whether the Sexual Misconduct

exclusion precludes coverage must be determined by reference to the language of the

Sexual Misconduct exclusion as it existed in the 2001 Policy, not the 2002 Policy.  (See

Benton v. Mutual of Omaha Ins. Co., 500 N.W.2d at 160).

Minnesota's courts have discussed in detail the type of notice that an insurer must

provide an insured when the insurer reduces coverage.  In Horace Mann Ins. Co. v.

Jackson, No. CX-97-175, 1997 WL 537022 (Minn. Ct. App. Nov. 13, 1997), the court

dealt with whether a "stuffer" included with a renewed policy constituted sufficient

notice of a reduction in coverage to require enforcement of the policy as then written. The policy at issue in <u>Horace Mann</u> was a homeowner policy covering a rental property. Minor tenants of the owner of the property suffered injuries from the ingestion of paint containing high concentrations of lead and the minors' parents commenced suit against the owner. After the insurer denied coverage for lead paint poisoning, the property owner brought a declaratory judgment action against his insurer.

The court concluded that the pollution exclusion in the policy, as written before the renewal, did not exclude claims for lead paint poisoning. <u>Id.</u> at *2. At the time of the injury to the children of the plaintiffs in the underlying action, however, the applicable policy contained both an absolute pollution exclusion, as well as a specific lead paint exclusion. The court therefore discussed the adequacy of the notice of these changes that the carrier purportedly provided to the property owner.

> [The insurer] prepared a "stuffer" to introduce the HM-3 policy. The stuffer was a mauve-colored 8" x 11" a [sic] tri-folded brochure that was mailed to each policyholder approximately 45 days prior to renewal. Along with the stuffer, [the insurer] sent each policyholder a copy of the new policy, the declaration sheet, a renewal notice, and any appropriate endorsements. Although [the policyholder] does not recall receiving the stuffer, he does not dispute its receipt.

> The front of the stuffer stated: "Enclosed is your new homeowner policy." Inside the stuffer, the first column read in part:

> 'You should know this information. Please take a few minutes to read about the improvements to your homeowners coverage. You'll see we've increased limits of coverage, expanded definitions, added some new coverages and improved service.'

> The first, second, and most of the third columns then discussed the specific enhancements and improvements in the new policy. At the bottom of the third column the stuffer read:

'These policy changes clarify the coverage. By making these changes, we can help control the costs of your policy.'

On the back of the stuffer the various "clarifications" were stated, including:

'Injury or damage from asbestos or lead paint is not covered.'

Finally, a toll-free phone number was provided in case the insured had any questions.

Id. at *1-2.

The back of the "stuffer" disclosed that injury from lead paint poisoning was not covered. Additionally, the insurer argued: (1) it mailed the stuffer and a complete copy of the policy more than 30 days before the renewal date; (2) the policyholder was directed to read the entire policy and to notice changes in the policy; (3) major changes and clarifications to the policy, including the lead paint exclusion, were listed in the stuffer; (4) a toll free number was provided; and (5) the policyholder was directed to call his agent or use the toll free number for answers to any questions. Id. at *3. Nevertheless, the Horace Mann court held that that this was inadequate notice and, therefore, the provision of the policy excluding coverage for lead paint poisoning, which substantially reduced the policyholder's coverage, was invalid. Id.

Specifically, the court found that a substantial limitation on coverage sandwiched between various clarifications to a policy on the back page of a tri-folded stuffer under the heading "Major Clarifications" is not prominently placed. Id. Furthermore, the stuffer did not clearly state that the renewal policy reduced coverage. Instead, it stated that the insurer increased limits of coverage, expanded definitions, added some new

25

coverages and improved service, from which a substantial reduction of coverage could not be inferred. Id. Minnesota law requires the insurer to bring the reduction in coverage to the policyholder's attention by sending a cover letter or by placing a conspicuous heading on the amendatory endorsement. Id.

Here, KidsPeace was not even afforded the type of notice that the Horace Mann court deemed insufficient under Minnesota law. KidsPeace did not receive a "stuffer" with the 2002 Policy. In fact, unlike the policyholder in Horace Mann, KidsPeace only received the 2002 Policy itself *after* the renewal, not prior to it. (Ex. D, Emigh Dep. at 68) KidsPeace received no notice whatsoever that the Sexual Misconduct exclusion had changed in any way. If the "stuffer" provided by the insurer in Horace Mann was inadequate under Minnesota law, then Lexington's failure to provided any information concerning the substantial reduction in KidsPeace's coverage falls woefully short of the notice insurers are required to give under Minnesota law.

The Eighth Circuit Court of Appeals dealt with a corporate policyholder's argument that it received inadequate notice of a substantial lessening of its coverage in Hawkins Chemical, Inc. v. Westchester Fire Ins. Co., 159 F.3d 348 (8th Cir. 1998). The insurer responded that the endorsement at issue did not substantially reduce the policyholder's coverage and, thus, did not trigger the insurer's duty under Minnesota law to provide notice of the reduction. Id. at 354. Because the endorsement omitted coverage only for pollution claims arising out of hostile fire rather than omitting coverage for all hostile fire claims, the insurer considered any omission substantively insignificant. The endorsement essentially transformed the insured's "absolute pollution exclusion" into a

"total pollution exclusion," a change that the insurance company described as "minor" and "isolated" when compared to the policy as a whole. Id.

The Eighth Circuit, however, concluded that the reduction was "substantial" for several reasons, including *the nature of the insured's business*. Id. The policyholder was a chemical distributor that stored chlorine and other potentially hazardous substances in its downtown warehouse. Id. The risk associated with such a business is readily apparent. When the insurer eliminated the hostile fire exception from the pollution exclusion, the insured suffered a reduction more "substantial" than might be felt by other insureds in other industries or locations. Id.

The insurer in Hawkins Chemical also argued that it provided adequate notice to the insured. Although the Court of Appeals noted that the endorsement bore a warning in bold capital letters that the endorsement changed the policy and constituted a "total pollution exclusion," the court held that this warning did not apprise the reader of the substantive difference between the endorsement at issue and the "absolute pollution exclusion" that it replaced. Id. (citing Samuelson v. Farm Bureau Mut. Ins. Co., 446 N.W.2d 428, 431 (Minn. Ct. App. 1989); Benton v. Mutual of Omaha Ins. Co., 500 N.W.2d 158, 160-61 (Minn. Ct. App. 1993)). The Eighth Circuit held that a substantial reduction must be explained to the insured in writing, including the fact that coverage has been reduced, and that the language used by the insurer did not explain the reduction. Id. Otherwise, the insured would be required to review the policies side-by-side in order to understand the change. Because of the insufficient notice, and lack of evidence that the officer of the policyholder actually understood the meaning of the endorsement when he

27

**REDACTED – FULL VERSION FILED UNDER SEAL**

# REDACTED – FULL VERSION FILED UNDER SEAL

# REDACTED – FULL VERSION FILED UNDER SEAL

materially changed provision – despite the fact that the specifics of that coverage had

been negotiated at length in the 2001 Policy -- invalidates the 2002 Policy's Sexual

Misconduct exclusion.  Therefore, the 2001 Policy's Sexual Misconduct exclusion should

govern the analysis of the extent of the coverage for TJ's claim against KidsPeace.  <u>See</u>

<u>Benton v. Mutual of Omaha Ins. Co.</u>, 500 N.W.2d at 160.  Because TJ's claim against

KidsPeace would not be precluded by the Sexual Misconduct exclusion contained in the

2001, the GL Coverage of the 2002 Policy provides coverage for TJ's claims against

KidsPeace and the Court should, therefore, grant KidsPeace's motion for summary

judgment.

> **D.    The Employer's Liability and Insured vs. Insured
> Exclusions Do Not Preclude Coverage for TJ's Claim
> <u>Against KidsPeace Because KidsPeace Was Not TJ's Employer.</u>**

Lexington also denied coverage to KidsPeace in the TJ Litigation based on the

Employer's Liability and the Insured vs. Insured exclusions in the 2002 Policy.  (See Ex.

BB, Denial Letter dated December 11, 2003; Ex. DD, Denial Letter dated July 13, 2006;

Ex. EE, Denial Letter dated October 2, 2006)  These exclusions are, however,

inapplicable here because KidsPeace did not employ TJ.

The Employer's Liability exclusion provides, in pertinent part, that the GL

Coverage does not apply to any occurrence, claim or suit arising out of bodily injury "to

an **employee** of **yours** arising out of and in the course of . . . [e]mployment by **you**; or . . .

[p]erforming duties related to the conduct of **your** business . . . ." (Ex. B, 2002 Policy at

HGL-4 (emphases in original))  This exclusion applies "[w]hether **you** may be liable as

an employer or in any other capacity . . . ." (Ex. B, 2002 Policy at HGL-4 (emphasis in original))

The Insured vs. Insured provision excludes "[a]ny **claims** made by one **Insured** against another **Insured**." (Ex. B, 2002 Policy at HGL-6 (emphases in original))  The policy's definition of "Insured" includes "**you**" and "**[y]our employees**, other than **your executive officers** . . . but only for acts within the scope of their employment by **you** or while performing duties related to the conduct of **your** business." (Ex. B, 2002 Policy at HGL-2 (emphases in original))   The 2002 Policy provides that "the words **you** and **your** mean the **First Named Insured**, including any other **Named Insured**." (Ex. B, 2002 Policy at 1 (emphases in original))  Accordingly, the terms "you" and "your" encompass both KidsPeace (the "First Named Insured") and Mesabi Academy (as "any other Named Insured"). (Ex. B, 2002 Policy at Declarations page and Endorsement No. 8)

The analysis of the Employer's Liability and the Insured vs. Insured exclusions hinges upon an interpretation of the meaning of the terms "you" and "your" (e.g., "an employee of yours," and employment "by you").  If "you" refers only to the insured against which a claim has been made and for which coverage is sought, i.e., KidsPeace, then the exclusions do not apply since T.J. is not an employee of KidsPeace. Alternatively, if "you" is read in the collective sense, as referring to all insureds in any potential claim covered under the 2002 Policy (e.g., Mesabi Academy, TJ, every other KidsPeace subsidiary, and all of their employees), without regard to whether a claim has been asserted against those insureds or whether those insured sought coverage under the

Policy, then TJ is an employee of "you" and an "Insured" and the Employer's Liability

and the Insured vs. Insured exclusions would apply.

However, because the terms "you" and "your" as used in the 2002 Policy must be

applied severally rather than collectively under the terms of the 2002 Policy's

"Separation of Insureds" provision, the Employer's Liability and the Insured vs. Insured

exclusions are inapplicable here.

The "Separation of Insureds" provision states:

> Except with respect to the Limits of Insurance and deductible, and except
> with respect to any rights or duties specifically assigned in this Policy to the
> **Named Insured**, this insurance applies:
>
> 1. *As if each Insured were the only insured*; and
>
> 2. *Separately to each Insured against whom a claim is made* or suit is
> brought.

(Ex. B, 2002 Policy at 10 (emphases added))  Minnesota courts, interpreting identical

separation of insureds clauses in other insurance policies, have held that such a clause

requires that coverage exclusions be construed only with reference to the particular

insured seeking coverage.  See Traveler's Indemnity Co. v. Bloomington Steel and

Supply Co., 718 N.W.2d 888, 894 (Minn. 2006) (holding that the language of the

separation of insureds provision requires each insured to be considered individually);

Utica Mut. Ins. Co. v. Emmco Ins. Co., 309 Minn. 21, 31, 243 N.W.2d 134, 140 (1976)

(holding that the employee exclusion in an insurance policy does not apply where there is

a separation of insureds provision and the injured party was not an employee of the

particular insured seeking coverage).

Here, based on this principle, because KidsPeace is the entity that sought

coverage for TJ's claim against it, rather than Mesabi Academy,[10] the "you" referred to in

the Employer's Liability exclusion, as well as the "you" in the definition of "Insured," is

KidsPeace individually, not KidsPeace and Mesabi Academy collectively.  In other

words, the severability clause in the 2002 Policy dictates that the exclusions must be

construed only with reference to the particular insured seeking coverage – here

KidsPeace.  "You" means KidsPeace only and not Mesabi Academy.  TJ was not a

KidsPeace employee, but was, instead, an employee of Mesabi Academy.  (Ex. A, Strom

Aff. at ¶ 6)  Therefore, she was not injured while in the employ of KidsPeace.

Accordingly, under the Separation of Insureds clause, the Employer's Liability exclusion

is inapplicable.  Likewise, because she was not employed by KidsPeace, TJ was not an

insured (which is defined as "you," i.e., KidsPeace, and "your employees," i.e.,

KidsPeace's employees), rendering the Insured vs. Insured exclusion irrelevant to a

determination of KidsPeace's coverage for the claim asserted against it by TJ.

Because TJ was not a KidsPeace employee, Minnesota law dictates that the

Employer's Liability and the Insured vs. Insured exclusions are inapplicable due to the

Separation of Insureds provision in the 2002 Policy.  Accordingly, TJ's claim against

KidsPeace is covered under the 2002 Policy and, therefore, KidsPeace's summary

judgment motion should be granted.

---

[10] Mesabi Academy did not seek coverage from Lexington for coverage of TJ's claims
against it.  Rather, the claims against Mesabi Academy – all of which had to do with
employment practices – were referred to Chubb pursuant to its Directors, Officers and
Trustee Liability insurance policy.  (Ex. AA, Chubb Letter of January 14, 2004)

**E.    The Employment Practices Exclusion Does Not
        Preclude Coverage for TJ's Claim Against KidsPeace.**

Similarly, the "Employment Practices" exclusion does not bar coverage here.  The

Employment Practices provision excludes coverage for:

> Any refusal to employ, termination of employment, coercion, demotion,
> evaluation, reassignment, discipline, defamation, harassment, humiliation,
> or other practices or policies related to employment or professional
> privileges.

(Ex. B, 2002 Policy at HGL – 5)  As set forth above, KidsPeace did not employ TJ.  As

such, a provision excluding coverage for claims based on wrongful employment practices

is inapplicable on its face.  See North American Bldg. Maintenance, Inc. v. Fireman's

Fund, 137 Cal.App.4th 627, 40 Cal.Rptr.3d 468 (2006) (holding that the employment-

related practices liability exclusion in an insured's commercial general liability policy

applied only where there was an employment relationship between the insured and third-

party); National Football League v. Vigilant Ins. Co., 36 A.D.3d 207, 214-15, 824

N.Y.S.2d 72, 77 (N.Y. App. Div. 2006) (holding that employment practices exclusion

only applies to claims against an employer arising out of an actual or potential

employment relationship).

Furthermore, the claims against KidsPeace in the TJ Litigation did not concern

any practices or policies related to TJ's employment, such as a claims relating to a

demotion, reassignment, termination, or any of the specific examples of employment

practices referenced in the exclusion. (Ex. B, 2002 Policy at HGL – 5)  The only cause of

action specific to KidsPeace in the TJ Litigation was a negligence claim.  The only

employment practices claims in the TJ Litigation were against Mesabi Academy, which

has not sought coverage from Lexington in this matter and which, as discussed above, must be considered separately under the "Separation of Insureds" provision in the 2002 Policy. (Ex. B, 2002 Policy at 10)  According to the Complaint filed in the TJ Litigation:

> KidsPeace undertook for compensation to provide training to Defendant Mesabi Academy of KidsPeace, Inc. staff including training involving security, handling sexual offenders, and handling harassment matters. . . . Defendant KidsPeace Corporation undertook for compensation to provide designs to Defendant Mesabi Academy of KidsPeace, Inc.'s facilities.

(Ex. V, TJ Compl. at ¶¶ 64-65)   TJ's allegations against KidsPeace do not stem from any purported employment relationship between KidsPeace and TJ.  KidsPeace was an outside entity with which Mesabi Academy contracted to provide certain services for Mesabi Academy. (Ex. J, Boyer Dep. at 15, 19; Ex. A. Strom Aff. ¶ 11)

KidsPeace was not TJ's employer and TJ's claims against KidsPeace did not concern any practices or policies related to any purported employment relationship between TJ and KidsPeace.  Accordingly, the Employment Practices exclusion does not exclude coverage for TJ's claims against KidsPeace.  Because none of the exclusions to the 2002 Policy cited by Lexington precludes coverage under the circumstances here, TJ's negligence claim against KidsPeace is covered under the GL Coverage of the 2002 Policy.  Accordingly, KidsPeace's motion for summary judgment should be granted.

## V.    CONCLUSION

Therefore, in view of the foregoing, Plaintiff KidsPeace Corporation respectfully requests that this Honorable Court grant its motion for summary judgment.

Respectfully submitted,

BRIGGS AND MORGAN, P.A.

BY:   /s/ W. Patrick Judge

Date: February 2, 2009

W. PATRICK JUDGE, ESQUIRE
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2157
Phone:(612) 977-8470
Fax:   (612) 977-8650

BY: /s/ Susan Ellis Wild

SUSAN ELLIS WILD, ESQUIRE
ERROL C. DEANS, JR, ESQUIRE
GROSS McGINLEY, LLP
33 South 7th Street
P.O. Box 4060
Allentown, PA 18105-4060
Phone: (610) 820-5450
Fax: (610) 820-6006
*Attorneys for Plaintiff KidsPeace Corporation*

*W:\WDOX\CLIENTS\kp-adver\LEXINGTON\00252430.DOC*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| KIDSPEACE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 07-1864 MJD/SRN |
| | ) | |
| v. | ) | |
| | ) | |
| LEXINGTON INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## WORD COUNT CERTIFICATE FOR PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

I, *Susan Wild*, certify that *Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment* complies with Local Rule 7.1(c).

I further certify that, in preparation of this memorandum, I used *Microsoft Office Word 2003 SP3*, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count.

I further certify that the above referenced memorandum contains 9,872 words.

Dated: February 2, 2009

BRIGGS AND MORGAN, P.A.

BY:   /s/ W. Patrick Judge
     W. PATRICK JUDGE, ESQUIRE
     2200 IDS Center
     80 South 8th Street
     Minneapolis, MN 55402-2157
     Phone: (612) 977-8470
     Fax:   (612) 977-8650

BY:
     SUSAN ELLIS WILD, ESQUIRE
     ERROL C. DEANS, JR, ESQUIRE
     GROSS McGINLEY, LLP
     33 South 7th Street
     P.O. Box 4060
     Allentown, PA  18105-4060
     Phone:  (610) 820-5450
     Fax:  (610) 820-6006
     *Attorneys for Plaintiff KidsPeace Corporation*